IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
CIVIL DIVISION

## INITIAL CASE MANAGEMENT CONFERENCE ORDER

CASE NO:  2021-11716

DENISE HODDER, INDIVIDUALLY AND AS ADMINISTRATOR OF THE
ESTATE OF BRENDA CAVILL, DECEASED
DAVID H ACE, AS THE ADMINISTRATOR OF THE ESTATE OF
JOYCE DUNLAP, DECEASED
JOHN P MYERS, AS THE ADMINISTRATOR OF THE ESTATE OF
SCOTT KENNEDY MYERS, DECEASED AND JILL LEMANSKI, AS THE
ADMINISTRATOR OF THE ESTATE OF JEFFERY LEMANSKI, DECEASED

*\* VERSUS \**

COMPREHENSIVE HEALTHCARE SERVICES MANAGEMENT LLC D/B/A
BRIGHTON REHABILITATION & WELLNESS CENTER AND PERSONAL CARE
MEDICAL ASSOCIATES, LLC

The above-captioned case is scheduled for an initial case management
conference before Judge ROSS, JAMES J. on March 28, 2022
at a time to be set by future Scheduling Order in Courtroom 6. The
attorneys and/or *pro se* litigants must be prepared to advise the Court of their intentions
with regard to discovery and pursuit of the case.  The Court will set a schedule based
upon the discussions at this conference.  This conference will not be continued absent a
motion for continuance, with good cause shown, presented in Civil Motions Court of this
Court held as listed in the court calendar.  **It shall be the responsibility of plaintiffs
counsel to serve a copy of this Order to all counsel/parties.  If this is an appeal from a
Magistrate District Judge decision, it shall be the responsibility of the appellants counsel
or the appellant to serve a copy of this Order to all counsel/parties.**

**It shall be the responsibility of all parties to complete and file with the Court
the Civil Case Summary Form provided in the Local Rule of Civil Procedure 301A.**

BY THE COURT,

_James J. Ross_

12/23/2021                              J.

FILED OR ISSUED

2021 DEC 22  PM 3: 07

MICHAEL ROSSI
PROTHONOTARY
BEAVER COUNTY, PA

# IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

## Civil Division

DENISE HODDER, Individually and as Administrator of the Estate of BRENDA CAVILL, Deceased;

DAVID H. ACE, as the Administrator of the Estate of JOYCE DUNLAP, Deceased;

JOHN P. MYERS, as the Administrator of the Estate of SCOTT KENNEDY MYERS, Deceased; and,

JILL LEMANSKI, as the Administrator of the Estate of JEFFERY LEMANSKI, Deceased;

        Plaintiffs,

    vs.

COMPREHENSIVE HEALTHCARE SERVICES MANAGEMENT LLC, d/b/a BRIGHTON REHABILITATION & WELLNESS CENTER and PERSONAL CARE MEDICAL ASSOCIATES, LLC,

        Defendants.

*11716-2021*

Case No.:

PLAINTIFFS' COMPLAINT

Counsel of Record for Plaintiffs:

ROBERT F. DALEY, ESQUIRE
Pa. I.D. No.: 81992
bdaley@peircelaw.com

ELIZABETH A. CHIAPPETTA, ESQUIRE
Pa. I.D. No.: 205736
echiappetta@peircelaw.com

ALLISON H. GREENE, ESQUIRE
Pa I.D. No.: 325648
agreene@peircelaw.com

ROBERT PEIRCE & ASSOCIATES, P.C.
Firm I.D.: 839

707 Grant Street
Suite 125
Pittsburgh, PA 15219
(412)-281-7229

1

PETER D. GIGLIONE,. ESQUIRE
Pa. I.D. No.: 89523
MASSA BUTLER GIGLIONE
Three Gateway Center, 401 Liberty Avenue
Pittsburgh, PA 15222
(412) 338-1800

KELLY M. TOCCI, ESQUIRE
Pa I.D. No.: 53572
MCMILLEN URICK TOCCI JONES
2131 Brodhead Road
Aliquippa, PA 15001
(724)-375-6683

## IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

### Civil Division

DENISE HODDER, Individually and as
Administrator of the Estate of BRENDA
CAVILL, Deceased;

DAVID H. ACE, as the Administrator of
the Estate of JOYCE DUNLAP, Deceased;

JOHN P. MYERS, as the Administrator of
the Estate of SCOTT KENNEDY MYERS,
Deceased; and,

JILL LEMANSKI, as the Administrator of
the Estate of JEFFERY LEMANSKI,          No.
Deceased;

    Plaintiffs,

  vs.

COMPREHENSIVE    HEALTHCARE
SERVICES MANAGEMENT LLC, d/b/a
BRIGHTON    REHABILITATION    &
WELLNESS CENTER and  PERSONAL
CARE MEDICAL ASSOCIATES, LLC,

    Defendants.

### NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice were served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you

1

by the court without further notice for any money claimed in the Complaint or for any claim or

relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE
A LAWYER OR CANNOT AFFORD ONE, THEN YOU SHOULD GO TO OR TELEPHONE
THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP:

**LAWYER REFERRAL SERVICE**
**BEAVER COUNTY BAR ASSOCIATION**
**788 Turnpike Street**
**Beaver, PA 15009**
**724-728-4888**

YOU MUST RESPOND TO THIS COMPLAINT WITHIN TWENTY (20) DAYS OR A

JUDGMENT FOR THE AMOUNT CLAIMED MAY BE ENTERED AGAINST YOU BEFORE

THE HEARING. IF YOU DO NOT APPEAR FOR THE HEARING, THE CASE MAY BE

HEARD IMMEDIATELY BEFORE A JUDGE. THERE IS NO RIGHT TO A TRIAL DE NOVO

ON APPEAL FROM A DECISION ENTERED BY A JUDGE.

**IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA**

**Civil Division**

DENISE HODDER, Individually and as
Administrator of the Estate of BRENDA
CAVILL, Deceased;

DAVID H. ACE, as the Administrator of
the Estate of JOYCE DUNLAP, Deceased;

No.

JOHN P. MYERS, as the Administrator of
the Estate of SCOTT KENNEDY MYERS,
Deceased; and,

JILL LEMANSKI, as the Administrator of
the Estate of JEFFERY LEMANSKI,
Deceased;

        Plaintiffs,

  vs.

COMPREHENSIVE      HEALTHCARE
SERVICES MANAGEMENT LLC, d/b/a
BRIGHTON    REHABILITATION    &
WELLNESS CENTER and PERSONAL
CARE MEDICAL ASSOCIATES, LLC,

       Defendants.

## PLAINTIFFS' COMPLAINT

AND NOW, come the Plaintiffs, Denise Hodder, Individually and as Administrator of the

Estate of Brenda Cavill, Deceased; David H. Ace, as Administrator of the Estate of Joyce Dunlap;

John P. Myers, as the Administrator of the Estate of Scott Kennedy Myers, Deceased; and Jill

Lemanski, Individually as the Administrator of the Estate of Jeffery Lemanski, Deceased; by

counsel, Robert F. Daley, Esquire; Elizabeth Chiappetta, Esquire; Allison Greene, Esquire; and

the law firm of Robert Peirce & Associates, P.C., and Kelly M. Tocci, Esquire and the law firm of

1

McMillen Urick Tocci Jones; and Peter D. Giglione, Esquire and the law firm of Massa Butler Giglione, and claim damages of the Defendants, Comprehensive HealthCare Management Services, LLC d/b/a Brighton Rehabilitation and Wellness Center (hereinafter "Brighton" or "Brighton Rehab") and Personal Care Medical Associates, LLC, and allege the following in support:

## PARTIES

### PLAINTIFFS

#### I. Brenda Joyce Cavill, Deceased

1.     Denise Hodder is an adult individual with an address of 248 Gelnmore Drive, Moon, Allegheny County, Pennsylvania 15108.

2.     Denise Hodder is the daughter of the deceased Brenda Joyce Cavill.

3.     Brenda Joyce Cavill died on April 21, 2020 at the age of 71.

4.     Denise Hodder was appointed Administrator of the Estate Brenda Joyce Cavill on February 12, 2021.

5.     As Administrator of the Estate of Brenda Joyce Cavill, Denise Hodder brings this action under 42 Pa Cons. Stat. § 8302 (Survival) on behalf of the Estate of Brenda Joyce Cavill,

6.     As the "personal representative" of the Estate of Brenda Joyce Cavill, Denise Hodder brings this action under 42 Pa Cons. Stat. § 8301 (Wrongful Death) and Pa. R. Civ. P. 2202(a) on her own behalf and on behalf of all wrongful death beneficiaries.

7.     The names and addresses of all persons legally entitled to recover damages for the wrongful death of Brenda Joyce Cavill, and their relationships to her, are as follows:

| Name | Address | Relationship |
|---|---|---|
| Michelle Stryker | 24 Gaylord Street Jamestown, NY 14701 | Daughter |

2

| | | |
|---|---|---|
| Faith Cavill-Horne | 2655 Kingwood Street<br>Pittsburgh, PA 15234 | Daughter |
| Larry Cavill | 137 Rosemont Drive<br>Moon Township, PA | Spouse |

8.      At no time during her life did Brenda Joyce Cavill bring an action to recover damages for her personal injuries, and no other action has been filed to recover damages for the wrongful death of Brenda Joyce Cavill.

## II. Joyce Dunlap, Deceased

9.      David H. Ace is an adult individual with an address of 212 Cherry Lane, Franklin, Venango County, Pennsylvania 16323.

10.      David H. Ace is the brother of the deceased, Joyce Dunlap.

11.      Joyce Dunlap died on April 14, 2020, at the age of 54.

12.      David H. Ace was appointed as the Administrator of the Estate of Joyce Dunlap on October 22, 2020.

13.      As Administrator of the Estate of Joyce Dunlap, David H. Ace brings this action under 42 Pa Cons. Stat. § 8302 (Survival) on behalf of the Estate of Joyce Dunlap.

14.      At no time during her life did Joyce Dunlap bring an action to recover damages for her personal injuries.

## III. Scott Kennedy Myers, Deceased

15.      John P. Myers is an adult individual with an address of 2924 Darlington Road, Beaver Falls, Beaver County, Pennsylvania 15010.

16.      John P. Myers is the brother of the deceased Scott Kennedy Myers.

3

17.     Scott Kennedy Myers died on May 3, 2020, at the age of 67.

18.     John P. Myers was appointed as the Administrator of the Estate of Scott Kennedy Myers on December 11, 2020.

19.     As Administrator of the Estate of Scott Kennedy Myers,  John P. Kennedy brings this action under 42 Pa Cons. Stat. § 8302 (Survival) on behalf of the Estate of Scott Kennedy Myers.

20.     At no time during his life did Scott Kennedy Myers, bring an action to recover damages for his personal injuries, and no other action has been filed to recover damages for the wrongful death of Scott Kennedy Myers

### IV. Jeffrey Lemanski, Deceased

21.     Jill Lemanski is an adult individual with an address of 2125 Larkins Way, Pittsburgh, Allegheny County, Pennsylvania 15203.

22.     Jill Lemanski is the sister of the deceased Jeffrey Lemanski.

23.     Jeffrey Lemanski died on May 7, 2020 at the age of 56.

24.     Jill Lemanski was appointed Administrator of the Estate of Jeffrey Lemanski on May 13, 2021.

25.     As Administrator of the Estate of Jeffrey Lemanski, Jill Lemanski brings this action under 42 Pa Cons. Stat. § 8302 (Survival) on behalf of the Estate of Jeffrey Lemanski.

26.     At no time during his life did Jeffrey Lemanski bring an action to recover damages for his personal injuries.

## DEFENDANTS

### I.   Comprehensive HealthCare Management Services, LLC
### d/b/a Brighton Rehabilitation and Wellness Center

27.     Defendant Comprehensive Health Care Management Services, LLC is a Pennsylvania limited liability corporation that operates a skilled nursing facility at 246 Friendship Circle, Beaver, Beaver County, Pennsylvania 15009.

28.     Defendant Comprehensive HealthCare Management Services, LLC operates its nursing facility under the fictitious name Brighton Rehabilitation and Wellness Center (hereinafter "Brighton" or "Brighton Rehab").

29.     Brighton Rehab is a nursing facility in Beaver County that has a maximum capacity of 589 residents. In March 2020, when COVID-19 began to spread to Western Pennsylvania, Brighton Rehab was home to 460, mostly elderly and/or sick citizens of Beaver County. These vulnerable individuals relied on Brighton Rehab to use its considerable resources[1] to protect them from COVID-19 to the best of its ability.

30.     At all relevant times, Brighton operated as a "long-term care nursing facility" as that term is defined by Pennsylvania's Health Care Facilities Act, 35 P.S. §448.802(a) *et. seq.,* which "promote[s] the public health and welfare through the establishment and enforcement of regulations setting minimum standards in the construction, maintenance and operation of health care facilities."

31.     At all relevant times, Brighton operated as a "skilled nursing facility" as that term is defined by Title XVIII of the Social Security Act, 42 U.S.C. §1395i-3 (Medicare) and as a

---

[1] Brighton's net profits from 2016 to 2018 totaled $10,897,508.00.

"nursing facility" as that term is defined in Title XIX of the Social Security Act, 42 U.S.C. §1396r (Medicaid).

32.    Accordingly, Brighton Rehabilitation and Wellness Center was a "health care provider" as that term is defined in the Medical Care Availability and Reduction of Error Act (MCARE), 40 P.S. § 1303.503.

33.    As a "health care provider" under the MCARE Act, Brighton is a "licensed professional" as defined by Pennsylvania Rule of Civil Procedure 1042.1, and Plaintiffs are asserting professional liability claims against this Defendant.

34.    As to Defendant Brighton Rehab, this Complaint is brought directly against Brighton for its managerial and operational negligence, carelessness, recklessness, and willful and wanton conduct. It is not brought against Brighton's "frontline" staff that provided direct care to residents. These resident caregivers (including but not limited to staff nurses, nursing aides, care technicians, therapists, and custodial staff) were placed in the untenable position of having to care for hundreds of residents through a pandemic while being untrained, unsupervised, understaffed, and unsupported by Brighton. Brighton failed to provide these caregivers with appropriate personal protective equipment (PPE) and left them to do the best they could in the dangerous environment Brighton's administration created.

## II.    Personal Care Medical Associates, LLC

35.    Defendant Personal Care Medical Associates, LLC is a Pennsylvania Professional Limited Liability Company employed and/or contracted by Brighton Rehabilitation and Wellness Center as the facility's Medical Director.

36.     Personal Care Medical Associates, LLC was hired to work as the Medical Director at Brighton starting in or around 2012.

37.     At all relevant times, Personal Care Medical Associates, LLC acted within the course and scope of its employment/contract and in its professional capacity as the Medical Director of Brighton Rehabilitation and Wellness Center.

38.     As the Medical Director of the Brighton facility, Personal Care Medical Associates, LLC was responsible for overseeing the facility in providing care to residents and ensuring the quality of care provided met all applicable standards.

39.     Personal Care Medical Associates, LLC was a "health care provider" as that term is defined in the Medical Care Availability and Reduction of Error Act (MCARE), 40 P.S. § 1303.503.

40.     As a "health care provider" under the MCARE Act, Personal Care Medical Associates LLC is a "licensed professional" as defined by Pennsylvania Rule of Civil Procedure 1042.1, and Plaintiffs are asserting professional liability claims against this Defendant.

## FACTUAL ALLEGATIONS

### I.     Brenda Joyce Cavill, Deceased

41.     Brenda Joyce Cavill ("Ms. Cavill") was admitted to Brighton on February 17, 2020 due to increasing care difficulties related to dementia in her prior living circumstances.

42.     Despite a UTI diagnosis and a history of COPD, Ms. Cavill was generally physically healthy at the time of her admission.

43.     However, on April 3, 2020 Ms. Cavill was exposed to COVID-19 and administered a test for the disease.

7

44.     On April 5, 2020, Ms. Cavill's COVID-19 test results indicated she was infected with the virus.

45.     In addition to treatment with Plaquenil, a Z-pack, and Zinc, Ms. Cavill was administered ever-increasing amounts of oxygen to maintain safe saturation levels.

46.     On April 12, 2020 Ms. Cavill's family requested she be sent to Heritage Valley Beaver Hospital for a chest x-ray and bloodwork.

47.     This request was granted, but Ms. Cavill was returned to Brighton after her chest x-ray and bloodwork were within normal limits.

48.     Brighton's notes indicate that, following her return, Ms. Cavill showed slow improvements in overall condition.

49.     On April 21, 2020, however, Ms. Cavill's condition suddenly worsened, with active rigors.

50.     On April 21, 2020, Ms. Cavill died.

51.     Ms. Cavill's Death Certificate reflects that her cause of death was COVID-19.


## II.     Joyce Dunlap, Deceased

52.     Joyce Dunlap ("Ms. Dunlap") was first admitted to Brighton on December 18, 2019.

53.     Prior to her admission to Brighton, Ms. Dunlap lived in several care facilities throughout Western Pennsylvania.

54.     In late March 2020, Ms. Dunlap's floor at Brighton reportedly had several positive COVID-19 cases but she was moved to a different floor once she tested negative.

55.     However, on March 31, 2020, Ms. Dunlap was again tested for COVID-19.

8

56.　At that time, Ms. Dunlap was experiencing severe bouts of diarrhea and diaphoretic episodes after a recent, unspecified COVID exposure.

57.　On April 4, 2020, Ms. Dunlap was transferred to Heritage Valley Beaver due to "testing positive for COVID-19 and increased difficulty when breathing."

58.　Brighton's records do not indicate when Ms. Dunlap tested positive for COVID-19.

59.　Ms. Dunlap was discharged from Heritage Valley Beaver on April 9, 2020.

60.　Approximately five days later, Ms. Dunlap became unresponsive and died on April 14, 2020.

61.　Ms. Dunlap's cause of death on her death certificate was listed as COVID-19.


### III.　Scott Kennedy Myers, Deceased

62.　Scott Kennedy Myers ("Mr. Myers") was a long-term resident of Brighton first admitted on October 14, 2018.

63.　On February 21, 2020, according to Brighton's records, Mr. Myers tested positive for COVID-19.

64.　Brighton's records do not reflect what prompted staff to test Mr. Myers and he was placed in a 14 day isolation.

65.　However, Mr. Myers was still quarantined on April 4, 2020.

66.　On April 23, 2020, Mr. Myers was still suffering from the effects of COVID-19 and was in respiratory failure.

67.　Less than ten days later, on May 3, 2020, Mr. Myers died at Brighton.

68.　Mr. Myers' cause of death on his Death Certificate was listed as COVID-19.

9

### IV.    Jeffrey Lemanski, Deceased

69.    Jeffrey Lemanski ("Mr. Lemanski") was admitted to Brighton in April 2019 for long-term care of his psychological challenges.

70.    Mr. Lemanski's sister, Jill Lemanski ("Ms. Lemanski") frequently called to check on her brother after learning COVID-19 was present in Brighton.

71.    Ms. Lemanski was always informed by Brighton staff that her brother was doing well.

72.    In late April 2020, Mr. Lemanski reported to Jill Lemanski that Brighton was allowing COVID-19 positive residents to mingle with uninfected residents in the facility's smoking room.

73.    No effort was made to separate individuals in the smoking room, enforce proper distancing, or enact other safety measures.

74.    On May 3, 2020, Mr. Lemanski began to exhibit symptoms of COVID-19 infection including a fever and lethargy.

75.    On May 4, 2020, Mr. Lemanski was confirmed to have COVID-19, and was noted to be hypoxic even with oxygen.

76.    Despite his diagnosis, Mr. Lemanski was kept in his room with a roommate; neither Mr. Lemanski nor his roommate wore a mask.

77.    Brighton staff informed Jill of Me. Lemanski's diagnosis of COVID-19 the day it was given.

78.    Brighton staff asked Jill Lemanski if she would like her brother taken to a hospital.

79.    Ms. Lemanski did not think this was in Mr. Lemanski's best interest and informed Brighton staff as such.

11

80.     Brighton staff then told Ms. Lemanski that, if she did not want Mr. Lemanski to go the hospital, she would have to change his advanced directives to Do Not Resuscitate ("DNR").

81.     Though she was not her brother's Attorney-in-Fact, Ms. Lemanski  complied and signed paperwork to change Mr. Lemanski's advanced directives to DNR.

82.     On May 6, 2020 Brighton informed Ms. Lemanski that her brother's -COVID-19 symptoms appeared to be abating.

83.     On May 7, 2020, however, Mr. Lemanski's medical condition declined rapidly, with ever-increasing respiratory distress.

84.     On May 7, 2020, Mr. Lemanski died.

85.     Mr. Lemanski's Death Certificate reflects that his cause of death was COVID-19.


**FACTS COMMON TO ALL CAUSES OF ACTION**

### I. Brighton's COVID Outbreak

86.     On March 6, 2020 Pennsylvania Governor Tom Wolf issued an Emergency Order which required Pennsylvania residents to stay at home unless they were essential workers.

87.     At the same time, the Pennsylvania Department of Health ("DOH"), issued new guidelines for its inspection of nursing facilities.[2]

---

[2] The Pennsylvania Department of Health licenses skilled nursing facilities and long-term care facilities located in the state of Pennsylvania. The DOH is also responsible for conducting regular and complaint-based inspections of the facilities it licenses to ensure that these facilities are complying with the mandatory requirements for operation. These mandatory requirements come from state and federal regulations that provide minimum standards for patient care. If the DOH finds that a nursing facility has violated a regulation, the DOH can issue a citation. A monetary fine may accompany this citation. The DOH will also require the nursing facility to submit a written plan to correct its deficiencies. The DOH will monitor the facility to ensure that deficiency is corrected.

88.     First, the DOH suspended all "regular" on-site inspections of health care facilities, even for facilities that had previously been cited for violating infection-control regulations.

89.     Next, the DOH limited its complaint-based inspections to only those situations where a facility was putting a resident in "immediate jeopardy."[3]  "Immediate jeopardy" was defined as when a nursing home's "noncompliance has placed the health and safety of recipients in its care at risk for serious injury, serious harm, serious impairment or death."[4]

90.     On March 12, 2020, Brighton placed its facility on "lockdown" and visitors were no longer allowed inside the building to see residents.

91.     By March 28, 2020, fourteen Brighton residents had tested positive for COVID-19.

92.     By March 30, 2020, two female residents had died from the virus.

93.     On March 31, 2020, the Service Employees International Union (SEIU) Healthcare Pennsylvania (the union representing healthcare workers at Brighton) reported that six employees of the facility had tested positive for COVID-19.

94.     By this date, nineteen residents were positive.

95.     David Thimons, D.O., Brighton's Medical Director on behalf of defendant Personal Care Medical Associates, LLC, repeatedly released statements claiming that he and other medical staff were properly handling the COVID virus at Brighton. Among Thimons's statements were, "Is our staff stretched? Yes. Absolutely. But, we are doing physicians rounds with every patient

---

[3] Candy Woodall, *As coronavirus deaths increase, Pa. nursing homes have less state and federal oversight*, YORK DAILY RECORD (Apr. 24, 2020), https://www.ydr.com/story/news/2020/04/24/coronavirus-leads-pa-stop-routine-safety-inspections-nursing-homes/3016487001/

[4] CENTERS FOR MEDICARE AND MEDICAID SERVICES, *State Operations Manuel Appendix Q – Core Guidelines for Determining Immediate Jeopardy* (March 6, 2019) https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_q_immedjeopardy.pdf

13

seven days a week. From a medical standpoint we are doing everything everyone is doing to care for [COVID-19] patients around the country."[5]

96.    Numbers at Brighton rose quickly, and by April 2, 2020, Brighton reported that 38 residents had tested positive for COVID-19, and a third resident had died from the virus.

97.    However, Brighton was not reporting accurate numbers. Brighton admitted that it was omitting residents from its total COVID count by excluding those residents that it had transferred to the hospital and those residents who had died.[6]

98.    On or around April 2, 2020, six Brighton employees walked off the job. They cited unsafe working conditions, including inadequate PPE and resources, as their reason for leaving.

99.    After more employees began to leave Brighton, residents' families also began to remove their loved ones from Brighton if possible. One such family member, identified in a KDKA news report as "Connie S.," stated, "Well the nurse basically said that to me with 100% certainty, everybody is going to get it. How she knew that, I don't know, but that was the final straw."[7]

100.    On April 3, 2020, a total of five Brighton residents had died from COVID-19.

101.    By April 4, 2020, forty-two Brighton residents and ten employees had tested positive for COVID-19.

102.    By April 6, 2020, Brighton began operating under the presumption that everyone in their facility, including staff and all residents, would be assumed to be positive for COVID-19.

---

[5] Sean D. Hamill, *With COVID-19 cases rising, Beaver County nursing home asks for help 'from everyone'*, PITTSBURGH POST-GAZETTE (Apr. 1, 2020), https://www.post-gazette.com/local/west/2020/04/01/With-COVID-19-cases-rising-Beaver-County-nursing-home-asks-for-help-from-everyone/stories/202004010121.

[6] Hamill, *supra*, note 4.

[7] CBS PITTSBURGH, *Coronavirus In Beaver County: Healthcare Workers Who Walked Off The Job Citing Unsafe Conditions Reach Deal With Owners* (Apr. 2, 2020) https://pittsburgh.cbslocal.com/2020/04/02/brighton-rehab-and-wellness-center-union-workers-owners-deal/.

14

Brighton issued a press release, stating, "Upon consultation with the Department of Health, and consistent with practices of facilities on the cutting edge of prevention and treatment, we are beginning to shift away from counting test results, and presuming all staff and residents may be positive."[8]

103.     By April 8, 2020, eleven residents of Brighton were confirmed dead and it was estimated that at least fifty residents and ten staff members were COVID-positive.

104.     Brighton's reporting of COVID numbers was so unreliable that Beaver County Commissioners began to express concern about the facility's handling of COVID-19 and could not get anyone from the facility to respond to their questions. Commissioner Tony Amadio stated, "We're having our own pandemic in Beaver County at one facility... Most of this – probably 80% is coming from one facility."[9] Commissioner Daniel Camp stated "Today [April 16, 2020] we asked the management at Brighton Rehab to be transparent –as it is important to the families of loved ones who are living there, the local medical facilities, and the medical community at large to understand the situation in their facility."[10]

105.     Despite these calls to action, Brighton did not publish its numbers of COVID cases and deaths transparently. In early April, Brighton stopped releasing numbers to the public, and families were forced to estimate the numbers by cross-checking data published by the

---

[8] Sean D. Hamill, *Beaver County nursing home now presumes everyone in building may have COVID-19*, PITTSBURGH POST-GAZETTE (Apr. 6, 2020), https://www.post-gazette.com/local/west/2020/04/06/Brighton-Rehab-and-Wellness-Beaver-PA-nursing-home-coronavirus-positive-cases/stories/202004060124.

[9] Amy Hudak, WPXI-TV, *Beaver Co. officials express concern about coronavirus in nursing home* (Apr. 16, 2020) https://www.wpxi.com/news/local/beaver-county/beaver-co-officials-express-concern-about-coronavirus-nursing-home/L3UDGZL23VC2VFPPVRVF4V55VU/.

[10] Hudak, *supra* note 8.

Pennsylvania Department of Health (categorized by county) with the data reported by the only other two nursing facilities in the county.[11]

106.    In April, the other nursing facilities in Beaver County (Concordia at Villa St. Joseph in Baden, and Rochester Manor and Villa) each had only one resident with COVID-19.[12]

107.    On April 16, 2020, it was suspected that Brighton had over 100 residents with COVID-19. The Pennsylvania Emergency Management Agency reported at least 104 positive cases, but the DOH suspected that the actual number was much higher.[13]

108.    On April 20, 2020, the DOH released data based on ZIP-code which revealed that Brighton likely had around 161 COVID-19 cases, which accounted for approximately 54% of Beaver County's 298 cases. Brighton was suspected to have had 30 residents die of COVID, which was nearly 85% of Beaver County's total deaths.[14]

## II. The Department of Health's April 17, 2020 Investigation

109.    Following numerous complaints about Brighton's handling of COVID-19, the Pennsylvania Department of Health conducted an on-site inspection of Brighton on April 17, 2020– evidently believing that Brighton was placing its residents in "immediate jeopardy."

110.    The DOH's inspection included reviewing Brighton's written policies and procedures, observing staff providing care to residents, and interviewing staff.

---

[11] Daveen Rae Kurutz, THE TIMES, *State data indicates 20 new cases at Brighton Rehab, total surpasses 260* (Apr. 27, 2020) https://www.timesonline.com/news/20200427/state-data-indicates-20-new-cases-at-brighton-rehab-total-surpasses-260.

[12] Kurutz, *supra* note 10.

[13] Chrissy Suttles, ELLWOOD CITY LEDGER, *County families mourn, celebrate loved ones lost at Brighton Rehab* (Apr. 21, 2020), https://www.ellwoodcityledger.com/news/20200421/county-families-mourn-celebrate-loved-ones-lost-at-brighton-rehab/1

[14] Suttles, *supra* note 12.

111.    From this inspection, the DOH cited Brighton for numerous infractions and deficiencies, including Brighton's non-compliance with federal requirements for infection control.

112.    The DOH concluded that "[Brighton] failed to make certain social distancing was maintained by staff, properly store clean linens and soiled laundry, provide proper supplies to perform hand washing, properly store biohazardous waste, ensure sinks are accessible to perform handwashing, properly wear gloves and perform hand hygiene and create a clean and sanitary environment which created the potential for the cross-contamination and the spread of diseases and infections for seven of eleven nursing units."[15]

113.    The DOH reported the following from its interview of Brighton employees:

    a.    "During an interview on 4/17/20, at 3:15 p.m. the Nursing Home Administrator (NHA) confirmed the facility failed to practice proper social distancing which caused the potential of cross contamination and the spread of diseases and infections."

    b.    "During an interview on 4/17/20 at 4:34 p.m. the Assistant Director of Nursing (ADON) Employee E25 confirmed that the facility failed to properly store clean linens and soiled laundry and provide soap for hand washing which created the potential for cross-contamination and the spread of diseases and infections."

    c.    During an interview on 4/17/20, at 4:44 p.m. the ADON Employee E25 confirmed that the facility failed to provide proper supplies to perform hand washing which created the potential for cross-contamination and the spread of diseases and infections.

114.    This was not Brighton's first time being cited by the Department of Health.

---

[15] DEPARTMENT OF HEALTH AND HUMAN SERVICES HEALTH CARE FINANCING ADMINISTRATION, *Statement of Deficiencies and Plan of Correction (POC)* (Apr. 17, 2020), https://sais.health.pa.gov/CommonPOC/Content/PublicWeb/PDF/1QKJ1191789051800L.PDF (Attached as Exhibit 2).

115.    In the past 30 months, Brighton received 110 total citations from the Department

of Health in the following general categories:

        a.      Nine citations for violations regarding "resident rights";

        b.      Three citations for violations regarding "staff treatment of residents";

        c.      One citation for a violation regarding "quality of life";

        d.      Two citations for violations regarding "resident assessment";

        e.      Seven citations for violations regarding "quality of care";

        f.      Seven citations for violations regarding "nursing and physician services";

        g.      Five citations for violations regarding "dietary services";

        h.      Five citations for violations regarding "ancillary services";

        i.      Two citations for violations regarding "physical environment";

        j.      Six citations for violations regarding "administration"; and

        k.      Sixty-three citations for violations regarding "building safety deficiencies."[16]

116.    This is 74 more citations than the average skilled nursing facility in Pennsylvania

received in the past 30 months, and 55 more citations than the average Pennsylvania facility of

similar size.[17]

117.    Additionally, Brighton had been cited three times in the past year alone (before the

Coronavirus pandemic began) for infection-control infractions.

---

[16] PENNSYLVANIA DEPARTMENT OF HEALTH, *Nursing Care Facility Performance Profile – 30 Month Period*, https://sais.health.pa.gov/commonpoc/Content/PublicWeb/PerformanceProfile.asp (Last accessed Sept. 8, 2020) (attached as Exhibit 3).
[17] PENNSYLVANIA DEPARTMENT OF HEALTH, *Nursing Care Facility Performance Profile – 30 Month Period, supra* note 17.

118.    On October 30, 2019, Brighton was cited by the DOH for violating federal requirements for infection prevent and control.[18]

119.    In this inspection, Brighton received a "below average" grade for a pattern of conditions that the DOH believed could lead to the "spread of infection and diseases."[19]

120.    The DOH ordered Brighton to implement a plan to address and remedy its infection control deficiencies.

121.    However, COVID numbers and deaths at Brighton continued to rise, evidencing that Brighton did not implement an adequate plan to get their COVID outbreaks under control.

122.    On Tuesday April 28, 2020, 13 Brighton residents died from COVID in one day, increasing the total death toll from 39 to 52 residents.

123.    By April 29, 2020, another 6 residents died from COVID, bringing the facility's total deaths to 58 residents. At this point, approximately 10% of Brighton's residents had died from COVID-19. [20]

124.    On this date, there were 248 Brighton residents with COVID.[21]

---

[18] DEPARTMENT OF HEALTH AND HUMAN SERVICES HEALTH CARE FINANCING ADMINISTRATION, *Statement of Deficiencies and Plan of Correction (POC)* (Oct. 30, 2019), https://sais.health.pa.gov/CommonPOC/Content/PublicWeb/PDF/1QKJ1191789051800L.PDF (Attached as Exhibit 4).

[19] DEPARTMENT OF HEALTH AND HUMAN SERVICES HEALTH CARE FINANCING ADMINISTRATION, *Statement of Deficiencies and Plan of Correction (POC)* (Oct. 30, 2019), Exhibit 4 *supra* note 19.

[20] Daveen Rae Kurutz, ELLWOOD CITY LEDGER, *Nursing home COVID deaths rise by 13 in Beaver County at Brighton Rehab* (Apr. 28, 2020), https://www.ellwoodcityledger.com/news/20200428/nursing-home-covid-deaths-rise-by-13-in-beaver-county-at-brighton-rehab.

[21] PENNSYLVANIA DEPARTMENT OF HEALTH, PENNSYLVANIA NATIONAL ELECTRONIC DISEASE SURVEILLANCE SYSTEM, *PA Coronavirus (COVID-19) Update Archive April 2020* (Apr. 30, 2020), https://www.health.pa.gov/topics/disease/coronavirus/Pages/April-Archive.aspx.

125.    Brighton was now responsible for 68% of Beaver County's total cases and 88% of the County's deaths.[22]

126.    In response to Brighton's mismanagement of its COVID outbreak, on April 15, 2020, the Department of Health appointed Long Hill Company to take over as the temporary manager of Brighton Rehab; though Brighton and Long Hill Company said that Long Hill's role was only to "consult."[23]

127.    The DOH also contracted with a local health care consulting company, Emergency Care Research Institute (ECRI), to aid with infection control at Brighton. ECRI began holding daily calls with Brighton staff.[24]

128.    These appointments at Brighton were announced to the public on April 30, 2020.

129.    U.S. Representative Conor Lamb publicly called for an investigation into Brighton on April 30, 2020, stating "I believe that our government owes these families a long, detailed and thorough investigation."[25]

### III. The Department of Health's May 5, 2020 Investigation

130.    By May 1, 2020, the death toll at Brighton had reached 60 residents, and there were 272 residents with COVID in the facility.

---

[22] Kurutz, *supra* note 21.

[23] Sean D. Hamill, PITTSBURGH POST-GAZETTE, *State will impose a temporary manager at troubled Beaver County nursing home* (May 8, 2020), https://www.post-gazette.com/local/west/2020/05/08/State-will-impose-a-temporary-manager-at-troubled-Beaver-County-nursing-home-again/stories/202005080110.

[24] Patrick Varine, TRIB LIVE, *State appoints 'temporary manager' for covid-stricken Beaver nursing home* (Apr. 30, 2020), https://triblive.com/local/regional/state-appoints-temporary-manager-for-covid-stricken-beaver-nursing-home/.

[25] J.D. Prose, THE TIMES, *Lamb calls for 'thorough investigation' of Brighton Rehab COVID-19 outbreak* (Apr. 30, 2020), https://www.timesonline.com/news/20200430/lamb-calls-for-thorough-investigation-of-brighton-rehab-covid-19-outbreak.

131.    Beginning on May 1, 2020, the Department of Health conducted a 4-day on-site investigation at Brighton Rehab.

132.    Issuing its report on May 5, 2020, the DOH found that Brighton was violating various state and federal regulations for long term care facilities, thereby failing to prevent the potential for cross-contamination of disease. Out of eleven total nursing units at Brighton, the DOH found that Brighton had placed the residents of nine units in "Immediate Jeopardy" (risk for serious injury, serious harm, serious impairment or death).[26]

133.    In its report, the DOH also found that the Nursing Home Administrator (NHA) and the Director of Nursing ("DON") failed to "effectively manage the facility to make certain that proper infection control procedures were followed to protect residents from cross-contamination, infections, virus and disease in the facility. [...] The NHA and the DON failed to fulfill their essential job duties to ensure that the federal and state guidelines and regulations were followed."[27]

134.    The Department of Health's May 5, 2020 report details that in just 90 minutes of the very first day of its inspection, the DOH witnessed more than two dozen regulatory violations, including:

    a.    Staff failed to wear proper Personal Protective Equipment (PPE) while in the building, creating the potential for cross-contamination and the spread of disease and infections;

    b.    Staff failed to follow proper hand hygiene procedures after glove removal;

    c.    There were no soap or paper towels at handwashing sinks;

---

[26]DEPARTMENT OF HEALTH AND HUMAN SERVICES HEALTH CARE FINANCING ADMINISTRATION, *Statement of Deficiencies and Plan of Correction (POC)* (May 5, 2020), https://sais.health.pa.gov/CommonPOC/Content/PublicWeb/PDF/OTFS1191789051800L.PDF, (Attached as Exhibit 5).
[27] DEPARTMENT OF HEALTH AND HUMAN SERVICES HEALTH CARE FINANCING ADMINISTRATION, *Statement of Deficiencies and Plan of Correction (POC)* (May 5, 2020), *supra* note 27.

d.    Employees walked through the hallways with masks down around their chins;

e.    Staff left clean linen carts open to the air, creating the potential for cross-contamination;

f.    Staff failed to maintain the proper 6-feet social distance between other employees who were eating in common areas without masks on;

g.    An employee obtained multiple residents' blood sugar levels using the same glucometer without changing gloves or practicing proper hand hygiene between residents;

h.    Staff allowed residents' waste baskets to overflow onto the floor, and left used gloves on the floor;

i.    An employee pushed a medical cart down the hall, touched and sorted through the drawers on the cart, and then locked the cart, all without taking off or changing gloves that they had worn while treating a resident; and,

j.    An employee emptied resident urinals while wearing gloves; that employee then used a temporal thermometer and pulse-oximeter on multiple patients without sanitizing the devices between uses or changing their gloves that they had worn to handle residents' urine. The employee never removed her gloves, performed hand hygiene, or cleaned the equipment between residents.

135.    The DOH issued Brighton a $58,260.00 fine, which would accrue an additional $110.00 each day until all violations were rectified.[28]

---

[28] Sean D. Hamill, PITTSBURGH POST-GAZETTE, *Inspection at Beaver County nursing home found residents were in 'Immediate Jeopardy'* (June 21, 2020), https://www.post-gazette.com/local/west/2020/06/21/Inspection-at-Beaver-County-nursing-home-found-residents-were-in-Immediate-Jeopardy/stories/202006180171.

22

## IV.    National Guard, Federal Agencies Intervene

136.    On May 11, 2020, the Pennsylvania National Guard stationed 38 guard members at Brighton to "get residents who are non-COVID and those who have recovered from the disease and separate them from those who have it, and save lives."[29]

137.    The same day the National Guard was employed to Brighton, the Department of Health hired another temporary manager for the facility. Allaire Health Services of Freehold, N.J., was hired to remain until Brighton achieved compliance with the recommendations of the DOH and the rate of infection was substantially reduced.[30]

138.    On May 12, 2020, United States Secretary of Health and Human Services, Alex Azar, announced that Brighton Rehab would be subject to a federal investigation. Federal investigators from the Department of Health and Human Services were at the facility collecting data and observing from May 12 until May 14, 2020.[31] Investigators from the federal Centers for Medicare and Medicaid Services (hereinafter "CMS") were still reviewing medical records from Brighton as late as mid-June.[32]

---

[29] Sean D. Hamill, PITTSBURGH POST-GAZETTE, *National Guard, temporary manager move in to troubled nursing home*, https://www.post-gazette.com/local/west/2020/05/11/Brighton-Rehabilitation-and-Wellness-Center-Beaver-PA-National-Guard-temporary-manager/stories/202005110109.

[30] PITTSBURGH'S ACTION NEWS 4, *PA Department of Health puts temporary manager at Brighton Rehabilitation and Wellness Center* (May 11, 2020), https://www.wtae.com/article/pa-department-of-health-puts-temporary-manager-at-brighton-rehabilitation-and-wellness-center/32437776.

[31] Nicole Ford, KDKA 2 CBS PITTSBURGH, *HHS Secretary Alex Azar: Federal Investigation Underway Into Brighton Rehab And Wellness Center, Where More Than 70 Residents Have Died* (May 29, 2020), https://pittsburgh.cbslocal.com/2020/05/29/federal-investigation-brighton-rehab-and-wellness-center/.

[32] Sean D. Hamill, PITTSBURGH POST-GAZETTE, *Feds fine Beaver County nursing home for COVID-19-related deficiencies* (June 11, 2020), https://www.post-gazette.com/local/west/2020/06/11/Brighton-Rehabilitation-and-Wellness-Center-Beaver-County-nursing-home-CMS-fine/stories/202006110148.

139.    Azar stated that the number of lives lost at the facility, totaling 71 residents as of May 12, 2020, was the reason for the investigation.[33]

140.    Following the federal investigation at Brighton Rehab, CMS Administrator Seema Verma announced that Brighton would be fined $62,580.00 for deficiencies with basic infection-prevention protocols. Additional fines would continue to accrue until corrective action was taken to ensure compliance.[34]

141.    The deficiencies CMS found were similar to those found by the Pennsylvania Department of Health, including: inadequate or non-existent PPE, the use of medical equipment that was not properly cleaned, and improper medical record documentation.[35]

142.    At the end of May, the Pennsylvania Department of Health released data reporting COVID numbers for each Long-Term Care Facility in the state. Brighton was reported to have 368 residents and 31 employees with COVID-19. The number of COVID deaths at Brighton reached 76 residents, the most deaths of any facility in the state.[36]

143.    On June 10, 2020, Brighton reported to the DOH that it was home to 334 residents, 126 fewer residents than the 460 residents Brighton reported having when the outbreak began in early March.[37]

144.    By June 11, 2020, Brighton reported that 332 of its residents and 104 employees were COVID-positive. Brighton's death toll was up to 80 residents.[38]

---

[33] Ford, *supra* note 32.

[34] Hamill, *supra* note 33.

[35] Hamill, *supra* note 33.

[36] PENNSYLVANIA DEPARTMENT OF HEALTH, *COVID-19 LTCF Data* (May 26, 2020), https://www.health.pa.gov/topics/Documents/Diseases%20and%20Conditions/COVID-19%20LTCF%20Data_5-26-20.pdf (Attached as Exhibit 6).

[37] Hamill, *supra* note 33.

[38] Hamill, *supra* note 33.

## V. Brighton's Reckless Response to the COVID-19 Outbreak

145.    Tremella Celestin worked at Brighton as a Certified Nursing Assistant ("CNA") from January 2020 until May 24, 2020.[39]

146.    According to Ms. Celestin, beginning sometime in March of 2020, facility management kept a list of all COVID-positive residents, which could be accessed by staff members.[40]

147.    However, there was no widespread testing of residents for COVID-19; only residents who displayed symptoms were tested.[41]

148.    At the same time, Brighton's documentation of which residents were positive was wholly inaccurate. Some residents who were considered positive were never even tested for COVID-19.

149.    Even after residents at Brighton received COVID-19 positive diagnoses in March of 2020, management did not isolate or separate COVID-positive and COVID-negative residents until around May 21, 2020.[42]

150.    Worse, the same staff members were assigned to care for COVID-positive and COVID-negative residents at the same time, before Personal Protective Equipment ("PPE") was issued.[43]

151.    Neither staff nor residents were consistently provided with PPE until the Pennsylvania National Guard arrived at Brighton.[44]

---

[39] See Declaration of Tremella Celestin, attached hereto as Exhibit 1.
[40] Celestin Declaration, *supra* note 40.
[41] Celestin Declaration, *supra* note 40.
[42] Celestin Declaration, *supra* note 40.
[43] Celestin Declaration, *supra* note 40.
[44] Celestin Declaration, *supra* note 40.

152.    At no point was Ms. Celestin provided with any type of in-service training related to infection prevention, precautions, or facility protocols, even though she and other nurse aides were provided with paperwork indicating that they had received training related to infections and other topics.[45]

## VI. Brighton's Profit from Understaffing

153.    Brighton Rehab gains much of its revenue and profit from taxpayer dollars by participating in federal and state funded Medicare and Medicaid programs.

154.    In the Medicare/Medicaid system, every nursing home resident is assigned an "acuity" level which reflects the number and severity of their medical conditions and illnesses.

155.    An individual resident's acuity level is determined by their Resource Utilization Group or "RUG" score, which is calculated as a part of a resident's Minimum Data Set ("MDS").

156.    A resident with a higher acuity level places a greater demand for care and services on a nursing home and its staff.

157.    A skilled nursing facility uses acuity levels to bill Medicare/Medicaid for reimbursement for daily care and services.

158.    Medicare/Medicaid reimburses nursing facilities at a higher rate for care and services based on the resident's acuity rate and number of therapy minutes provided.

159.    Accordingly, the higher the facility's acuity levels, the more revenue the facility generates from Medicare and Medicaid.

160.    This creates a financial incentive for nursing homes, such as Brighton Rehab, to admit and keep residents with greater mental, physical, and psychosocial needs.

---

[45] Celestin Declaration, *supra* note 40.

161.    Each year, skilled nursing facilities like Brighton must submit a Medicare Cost Report to The Centers Medicare and Medicaid Services ("CMS"), in which the facility must account for each dollar received and spent. Part of this report is each resident's daily RUG score.

162.    Medicare/ Medicaid labels its highest and second-highest rates of reimbursement as "Ultra High" and "Very High" respectively.

163.    The Cost Report submitted by Comprehensive Healthcare Services Management, LLC for Brighton Rehabilitation and Wellness Center for 2016 stated that 92.12% of all Brighton residents had been assigned RUG scores within these top two rates of reimbursement. Of all Brighton residents, 82.02% were assigned "Ultra High" RUG scores, providing Brighton with the highest rate of Medicare reimbursement for these residents. An additional 10.1% of Brighton residents were assessed to have "Very High" RUG scores, providing Brighton with the second-highest rate of Medicare reimbursement for these residents.[46]

164.    In 2017, Brighton's Cost Report showed that 92.43% of all residents residing in the facility were assigned "Ultra High" or "Very High" RUG score. This year, Brighton's "Ultra High" RUG scores increased to 84.44% of all residents, with 7.99% of residents assigned "Very High" RUG scores.[47]

165.    Brighton's 2018 Cost Report showed that 91.19% of all residents residing in the facility were assigned "Ultra High" (78.3%) or "Very High" (12.89%) RUG scores.[48]

166.    With acuity levels this high, CMS expects that more care and resources will be necessary to meet the needs of Brighton's residents.

---

[46] See 2017 Cost Report, attached hereto as Exhibit 7.
[47] 2017 Cost Report, *supra* note 47.
[48] See 2018 Cost Report, attached hereto as Exhibit 8.

167.    Therefore, CMS reimburses Brighton at a high rate so that Brighton can provide adequate care to its residents.

168.    A resident's acuity level is also used for CMS to determine the number of hours it expects the nursing home will have to provide per day to meet the resident's needs.

169.    CMS then pays the facility according to the hourly rate of reimbursement for the expected number of nursing hours.

170.    At the end of each quarter, the nursing home must provide CMS with an accounting of the hours it actually spent providing nursing care to residents.

171.    To calculate nursing hours, facilities like Brighton calculate the hours spent providing care to residents by their Registered Nurses (RN), Licensed Practical Nurses ("LPN"), and Aides.

172.    In 2016, Brighton failed to provide sufficient and expected licensed care to its residents and failed to supply expected aide care to its residents.

173.    In 2016, Brighton provided an average of 1.49 nursing hours (LPN hours plus RN hours) to each resident each day,[49] though Brighton was paid by CMS to provide 2.07 nursing hours to each resident each day.[50]

174.    In 2016, Brighton provided the majority of its nursing care using LPNs. And, while Brighton did provide sufficient LPN hours, Brighton failed to provide sufficient RN hours. In particular, Brighton was paid by CMS, based on Brighton's reported acuity, to provide 1.33 RN

---

[49] See Quarterly Report on CMS Expected Staffing, attached as Exhibit 9. See also RUGs, attached as Exhibit 10.

[50] CMS Expected Staffing and RUGs, *supra* note 50.

hours to each resident each day.[51]  However, Brighton actually only provided 0.587 hours of RN care to each resident each day.[52]

175.    Similarly, Brighton failed to provide sufficient Certified Nurse Assistant (CNA) care to its residents. In 2016, Brighton provided an average (based on Brighton's quarterly reporting) of 2.09 hours of aide care to its residents each day, though Brighton was paid by CMS to provide 2.42 hours of aide care to its residents each day.

176.    In 2017, Brighton again failed to provide sufficient and expected licensed care to its residents and failed to supply expected aide care to its residents.

177.    In 2017, Brighton provided an average (based on Brighton's quarterly reporting) of 1.46 nursing hours (LPN plus RN) to each resident each day.

178.    However, in 2017, Brighton was required to provide (based on its reported resident acuity) 2.20 nursing hours (LPN plus RN) to each resident each day.

179.    In 2017, Brighton provided the majority of its nursing care using LPNs. And, while Brighton did provide sufficient LPN hours, Brighton failed to provide sufficient RN hours.  In particular, Brighton was required to provide 1.43 RN hours to each resident each day.[53]  However, Brighton actually only reported 0.554 hours or RN care to each resident each day.[54]

180.    Similarly, in 2017 Brighton failed to provide sufficient Certified Nurse Assistant (CNA) care to its residents.

181.    In 2017, Brighton provided on average (based on Brighton's quarterly reporting) an average of 2.15 hours of aide care to its residents each day.[55]

---

[51] CMS Expected Staffing and RUGs, *supra* note 50.
[52] CMS Expected Staffing and RUGs, *supra* note 50.
[53] CMS Expected Staffing and RUGs, *supra* note 50.
[54] CMS Expected Staffing and RUGs, *supra* note 50.
[55] CMS Expected Staffing and RUGs, *supra* note 50.

182.    However, in 2017, Brighton was required to provide (based on its reported resident acuity) 2.50 hours of aide care to its residents each day.[56]

183.    In 2017, Brighton provided an average of 2.76 nursing hours to each resident each day.[57]

184.    In calendar year 2017, Brighton's Quarterly reporting for CNA, LPN, and RN hours were identical across all 4 quarters of that year.[58]

185.    In the first quarter of 2018, Brighton failed to provide sufficient and expected licensed care to its residents and failed to supply expected aide care to its residents.[59]

186.    In the first quarter of 2018, Brighton provided an average of 1.52 nursing hours (LPN plus RN) to each resident each day.[60]

187.    However, in the first quarter of 2018, Brighton was required to provide (based on its reported resident acuity) 2.27 nursing hours (LPN plus RN) to each resident each day.[61]

188.    In the first quarter of 2018, Brighton provided the majority of its nursing care using LPNs. And, while Brighton did provide sufficient LPN hours during that quarter, Brighton failed to provide sufficient RN hours.  In particular, Brighton was required (based on its reported acuity) to provide 1.50 RN hours to each resident each day.[62]  However, Brighton actually only reported 0.729 hours or RN care to each resident each day.[63]

---

[56] CMS Expected Staffing and RUGs, *supra* note 50.
[57] CMS Expected Staffing and RUGs, *supra* note 50.
[58] CMS Expected Staffing and RUGs, *supra* note 50.
[59] CMS Expected Staffing and RUGs, *supra* note 50.
[60] CMS Expected Staffing and RUGs, *supra* note 50.
[61] CMS Expected Staffing and RUGs, *supra* note 50.
[62] CMS Expected Staffing and RUGs, *supra* note 50.
[63] CMS Expected Staffing and RUGs, *supra* note 50.

189.    In sum, for 2016, 2017 and 2018, Brighton failed to provide the requisite total hours of average daily care for its residents:

a.      In 2016, Brighton provided average total care per day per resident of 3.59 hours when, based on its own self-reported acuity, it should have provided at least 4.50 hours of total care per day per resident.[64]

b.      In 2017, Brighton provided average total care per day per resident of 3.61 hours when, based on its own self-reported acuity, it should have provided at least 4.71 hours of total care per day per resident.[65]

c.      In the first quarter of 2018, Brighton average total care per day per resident of 4.16 hours when, based on its own self-reported acuity, it should have provided at least 4.73 hours of total care per day per resident.[66]

190.    While data from CMS is not presently available beyond the first quarter of 2018, upon information and belief, when that data does become available, it will show similar results, and it will show that Brighton continued to systemically understaff through the present.

191.    Frequently, staffing numbers at Brighton were low enough that one nurse would be left to care for up to 55 residents at a time.

192.    When CMS pays facilities like Brighton at the highest acuity levels, CMS assumes that facilities will use that funding to meet residents' needs, primarily by hiring additional staff to provide care. Facilities primarily show that they have done this by meeting CMS's expected nursing hours.

193.    But instead of using CMS's funding to hire additional nursing staff, Brighton continually staffed below the hours CMS paid it for and pocketed the additional CMS money as profit.

---

[64] CMS Expected Staffing and RUGs, *supra* note 50.
[65] CMS Expected Staffing and RUGs, *supra* note 50.
[66] CMS Expected Staffing and RUGs, *supra* note 50.

194.    In 2016, Brighton made $5,647,800.00 from CMS by staffing under the hours CMS paid for.[67]

195.    In 2017, Brighton made $16,981,605.00 from CMS by staffing under the hours CMS paid for.[68]

196.    In 2018, Brighton made $8,775,360.00 from CMS by staffing under the hours CMS paid for.[69]

197.    Despite receiving this funding from Medicare and Medicaid, Brighton and its administration failed to ensure, through its operational, budgetary, and managerial decisions, that Brighton was sufficiently staffed to meet the individual needs of all residents, including the needs of the Plaintiff residents.

198.    With Brighton failing to provide the number of hours of nursing care that CMS expected it must in order to provide adequate care to its residents, Brighton was quite literally "understaffed."

199.    It is no surprise then that as the Department of Health observed, Brighton's nursing staff cut corners while struggling to care for hundreds of residents during the pandemic.

200.    Ms. Celestin also confirms that Brighton operated while understaffed.[70]

201.    According to her Declaration, Ms. Celestin was normally required to care for forty or more residents during the 3 p.m. to 11 p.m. shift; she was unable to properly do her job because of the low staffing levels.[71]

---

[67] See Nursing Care Costs Sheet, attached as Exhibit 11.
[68] Nursing Care Costs Sheet, *supra* note 68.
[69] Nursing Care Costs Sheet, *supra* note 68.
[70] Celestin Declaration, *supra* note 40.
[71] Celestin Declaration, *supra* note 40.

202.    For example, residents who required assistance with mobility (including turning and repositioning in their beds and chairs to prevent pressure wounds) were not timely provided it; Ms. Celestin could not assist residents to the bathroom in a timely manner; and could not timely respond to call lights.[72]

203.    Even though care was not properly provided to the residents, someone at Brighton would complete the Activities of Daily Living records indicating that care was in fact properly provided.[73]

204.    In this way, Brighton's understaffing caused cross-contamination among residents and staff and allowed the facility to become a breeding ground for the Coronavirus spread until most residents had contracted the virus and more than 70 residents had died.

### COUNT I

### CORPORATE NEGLIGENCE – SURVIVAL

**Plaintiffs v. Comprehensive Healthcare Services Management LLC
d/b/a Brighton Rehabilitation & Wellness Center**

205.    Plaintiffs incorporate all preceding paragraphs as if set forth more fully herein.

206.    Comprehensive Healthcare Services Management LLC exercised complete control over all aspects of the operation and management of the Brighton Rehab facility prior to and during the COVID outbreak at Brighton, including, but not limited to: creating, setting, funding, and/or implementing budgets; creating and maintaining business relationships with related parties as defined by the Centers for Medicare and Medicaid Services ("CMS") that resulted in an undercapitalized and understaffed nursing home; hiring and training caregiving staff; monitoring resident acuity levels and staffing sufficiently to meet each resident's needs; admitting and

---

[72] Celestin Declaration, *supra* note 40.
[73] Celestin Declaration, *supra* note 40.

discharging residents to and from the facility; and creating and enforcing written policies and procedures to provide for the safety and well-being of all residents.

207.     Each of these managerial and operational functions had a direct impact on the quality of care provided to the Deceased Plaintiff Residents and other residents in the Brighton facility.

208.     Comprehensive Healthcare Services Management, LLC had a duty to act prudently, and had a duty to provide reasonable and ordinary care and care services to the Deceased Plaintiff Residents.

209.     Comprehensive Healthcare Services Management, LLC had a duty to provide caregiving staff with sufficient personal protective equipment, sanitation and hygiene products, and medical tools to prevent cross-contamination and the spread of infection to residents and other staff.

210.     Comprehensive Healthcare Services Management, LLC had a duty to ensure that all persons providing care within the Brighton facility were competent to provide that care.

211.     Comprehensive Healthcare Services Management, LLC had a duty to oversee all persons who practice medicine in the Brighton facility.

212.     Comprehensive Healthcare Services Management, LLC had a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for residents of the Brighton facility, such as the Deceased Plaintiff Residents.

213.     Comprehensive Healthcare Services Management, LLC had a duty to ensure that the Brighton facility was sufficiently staffed to meet the needs of its residents.

214.     Comprehensive Healthcare Services Management, LLC negligently, recklessly, willfully and wantonly breached its duties owed to the Plaintiffs' Decedents in the following ways:

34

a.    By failing to establish and maintain an infection prevention and control program ("IPCP") that provided a safe, sanitary and comfortable environment which prevented the development and transmission of communicable diseases and infections, namely the transmission of COVID-19; as pled herein,

b.    By failing to establish adequate written standards, policies, and procedures to identify possible communicable diseases in the Brighton facility before the infection could spread to other persons in the facility, as pled herein;

c.    By failing to establish adequate written standards, policies, and procedures that enumerate when possible incidents of communicable disease or infections should be reported, and who they should be reported to, as pled herein;

d.    By failing to establish adequate written standards, policies, and procedures for precautions and safeguards to prevent the spread of infection within the Brighton facility, as pled herein;

e.    By failing to establish adequate written standards, policies, and procedures for when and how a resident with a communicable infection should be isolated from residents and other staff, as pled herein;

f.    By failing to establish adequate written standards, policies, and procedures for when and how a staff member with exposure to a communicable infection should be prevented from exposing residents and other staff, as pled herein;

g.    By failing to provide adequate training and education to caregiving staff on infection prevention and control, as pled herein;

h.    By failing to ensure all caregiving staff members attended appropriate trainings and were properly trained on infection prevention and control, and by failing to ensure all staff were properly re-educated as required; as pled herein,

i.    By failing to ensure that Personal Care Medical Associates, LLC was properly overseeing the facility in providing care to residents;

35

j.      By failing to ensure that Personal Care Medical Associates, LLC was properly safeguarding that the quality of care provided met all applicable standards;

k.      By failing to ensure that Personal Care Medical Associates, LLC, was properly auditing infection control procedures in the Brighton facility, as required;

l.      By failing to truthfully communicate information to residents and their families about the spread of COVID-19 within the Brighton facility, so as to allow them to make informed decisions for the wellbeing of their loved ones in the Brighton facility, as pled herein;

m.      By failing to truthfully communicate with other medical providers and the Pennsylvania Department of Health about the spread of COVID-19 within the Brighton facility, as pled herein;

n.      By failing to request assistance from the proper authorities when it became apparent that COVID-19 was quickly spreading throughout the Brighton facility, as pled herein;

o.      By failing to test Brighton's residents and staff for COVID-19 so as to properly separate and isolate COVID-positive individuals from those who had not been exposed to the virus, as pled herein;

p.      By stopping testing and presuming that all residents and all staff were COVID-positive instead of taking proper precautions to identify and isolate those residents and staff who had not yet contracted the virus, as pled herein;

q.      By failing to ensure that proper social distancing was maintained by Brighton's residents and staff, as pled herein;

r.      By failing to provide adequate supplies for residents and staff to wash their hands to prevent the spread of infection, as pled herein;

s.      By failing to ensure that sinks were accessible for residents and staff to wash their hands, as pled herein;

t.      By failing to ensure that all employees washed their hands regularly, as pled herein;

36

u.    By failing to properly store biohazardous waste, as pled herein;

v.    By failing to ensure that all employees wore gloves and changed their gloves when appropriate, as pled herein;

w.    By failing to ensure that all employees had access to sufficient Personal Protective Equipment (PPE), as pled herein;

x.    By failing to ensure that all staff was trained in the proper use of PPE, as pled herein;

y.    By failing to ensure that all staff used PPE properly, as pled herein;

z.    By failing to ensure all employees were trained on, and followed, guidelines for sanitizing medical equipment between uses with different residents, as pled herein;

aa.    By failing to create a clean and sanitary environment, the lack of which created the potential for cross-contamination and the spread of diseases and infections, as pled herein;

bb.    By failing to recognize and appreciate the extreme risk that COVID-19 posed to Brighton's residents, who—due to age, pre-existing conditions, and living arrangements—were already some of the most vulnerable individuals in our communities, as pled herein;

cc.    By failing to create and implement a plan to house COVID-positive residents in an isolated unit of the Brighton facility to avoid exposing residents who were not COVID-positive, as pled herein;

dd.    By intentionally understaffing the Brighton facility in order to keep the surplus Medicare and Medicaid funding as revenue, which resulted in Brighton's nursing staff being unable to meet the needs of the facility's residents, as pled herein.

215.    At all relevant times, Comprehensive Healthcare Services Management, LLC had a duty to not violate the legal rights of any resident, and had a duty to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care

Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42

C.F.R. §483 et seq. (Centers for Medicare & Medicaid Services, Department of Health and Human

Services Requirements for Long Term Care Facilities).

216.    These regulations comprise part of the standard of care that facilities like Brighton

must provide to its residents.

217.    These regulations are designed and intended to protect the interests of skilled

nursing and long-term care residents such as the Deceased Plaintiff Residents.

218.    These regulations are designed and intended to protect the interests of skilled

nursing and long-term care residents against the hazards the Deceased Plaintiff Residents

encountered at Brighton and the type of harm they suffered – specifically, contracting viral

infections from other residents and/or staff.

219.    Comprehensive Healthcare Services Management, LLC negligently, recklessly,

willfully and wantonly violated these regulations in the following ways:

       a.    By the failure of an effective governing body to adopt and
enforce rules for the health care and safety of the residents,
as required by 28 Pa. Code § 201.18, as pled herein;

       b.    By failing to conduct ongoing coordinated educational
programs for the development and improvement of skills of
the facility's personnel, including training related to
problems, needs, and rights of the residents, as required by
28 Pa. Code § 201.20(a), as pled herein;

       c.    By failing to conduct in-service training at least annually
which includes infection prevention and control, as required
by 28 Pa. Code §201.20(c), as pled herein;

       d.    By admitting or re-admitting residents to the Brighton
facility with disease in the communicable stage when the
facility did not have the capability to care for the needs of
the residents, as prohibited by 28 Pa. Code §201.24(d), as
pled herein;

38

e.  By failing to adequately train staff in proper implementation of policies and procedures, as required by 28 Pa. Code § 201.29(d), as pled herein;

f.  By failing to treat Plaintiffs with consideration, respect, and full recognition of dignity and individuality, as required by 28 Pa. Code § 201.29(j), as pled herein;

g.  By failing to report to the appropriate health agencies and appropriate Division of Nursing Care Facilities filed office when a resident developed a reportable disease, as required by 28 Pa. Code § 211.1(a), as pled herein;

h.  By failing to design and implement resident care policies to ensure the Plaintiffs' total medical needs were met and that they were protected from infection, as required by 28 Pa. Code § 211.10(d), as pled herein;

i.  By failing to update the facility's resident care policies as necessary to meet the total medical and psychosocial needs of Brighton's residents, as required by 28 Pa. Code §211.10, as pled herein;

j.  By failing to provide services by a sufficient number of nursing personnel on a 24-hour basis to provide nursing care to meet the needs of all residents, as required by 28 Pa. Code § 211.12, as pled herein;

k.  By failing to protect and promote Plaintiffs' resident rights, as required by 42 C.F.R. § 483.10, as pled herein;

l.  By failing to treat each resident in a manner and in an environment that promoted maintenance or enhancement of his or her quality of life, as required by 42 C.F.R. § 483.10(a)(1), as pled herein;

m.  By failing to treat each resident with respect and dignity, as required by 42 C.F.R. § 483.10(e), as pled herein;

n.  By failing to immediately notify residents' representatives when there were significant changes in residents' physical statuses, as required by 42 C.F.R. § 483.10(g)(14), as pled herein;

o.  By failing to provide residents with a safe, clean, comfortable, and homelike environment, as required by 42 C.F.R. § 483.10(i), as pled herein;

p.  By failing to provide housekeeping and maintenance services necessary to maintain a sanitary, orderly, and comfortable interior, as require by 42 C.F.R. § 483.10(i)(2), as pled herein;

q.  By discouraging residents from communicating with federal, state, or local officials, as prohibited by 42 C.F.R. § 483.10(k), as pled herein;

r.  By failing to conduct a comprehensive assessment for the Plaintiff residents after significant changes in their condition, as required by 42 C.F.R. § 483.20, as pled herein;

s.  By failing to ensure all residents, including the Plaintiff residents, received the necessary care and services to attain or maintain the highest practicable qualify of life, including physical, mental, and psychosocial well-being, as required by 42 C.F.R. § 483.24, as pled herein;

t.  By failing to ensure all residents, including Plaintiffs, received treatment and care in accordance with professional standards of practice, as required by 42 C.F.R. § 483.25, as pled herein;

u.  By failing to have sufficient nursing staff with the appropriate competencies and skill sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population, as required by 42 C.F.R. § 483.35, as pled herein;

v.  By failing to provide nursing services by sufficient registered nurses on a 24-hour basis to the plaintiff residents in accordance with their care plans, as required by 42 C.F.R. § 483.35(b), as pled herein;

w.  By failing to obtain diagnostic services to meet the needs of its residents, as required by 42 C.F.R. § 483.50(b), as pled herein;

x.     By failing to administer the Brighton facility in a manner that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as required by 42 C.F.R. § 483.70, as pled herein;

y.     By failing to operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles, as required by 42 C.F.R. § 483.70, as pled herein;

z.     By failing to conduct and document a facility-wide assessment to determine what resources were necessary to care for the facility's residents competently during both day-to-day operations and emergencies; to review and update this assessment whenever there was any change that would require a substantial modification to any part of this assessment; and for this assessment to include the care required by the resident population considering the types of diseases and overall acuity present within that population, as required by 42 C.F.R. § 483.70(e), as pled herein;

aa.    By failing to establish and maintain an emergency preparedness plan that meets the requirements of 42 C.F.R. § 483.73, as pled herein;

bb.    By failing to establish and maintain an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of communicable diseases and infection, as required 42 C.F.R. § 483.80, as pled herein;

cc.    By failing to establish a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, and visitors, as required by 42 C.F.R. § 483.80(a)(1), as pled herein;

dd.    By failing to establish a system of surveillance designed to identify possible communicable diseases or infections before they can spread to other persons in the facility, as required by 42 C.F.R. § 483.80(a)(2)(i), as pled herein;

ee.  By failing to establish a system which specified standard and transmission-based precautions to be followed to prevent spread of infections, as required by 42 C.F.R. § 483.80(a)(2)(iii), as pled herein;

ff.  By failing to establish a system which specified when and how isolation should be used for a resident, including the type and duration of the isolation, as required by 42 C.F.R. § 483.80(a)(2)(iv), as pled herein; and,

gg.  By failing to establish a system which specified the circumstances under which the facility must prohibit employees with a communicable disease from direct contact with residents, if direct contract will transmit the disease, as required by 42 C.F.R. § 483.80(a)(2)(v), as pled herein;

hh.  By failing to inform residents and their families of COVID-19 occurrences in the facility, as required by 42 C.F.R. § 483.80(g)(3) as pled herein;

ii.  By failing to provide a safe, functional, sanitary, and comfortable environment to residents, staff, and the public, as required by 42 C.F.R. § 483.90, as pled herein;

jj.  By failing to develop, implement, and maintain an effective training program for all new and existing staff, individuals providing services under a contractual arrangement, and volunteers, as required by 42 C.F.R. § 483.95, as pled herein; and,

kk.  By failing to include as part of its infection prevention and control program mandatory training that includes the written standards, policies, and procedures for the program, as required by 42 C.F.R. § 483.95(e), as pled herein.

220.    As a direct and proximate result of the negligent acts and omissions of Comprehensive Healthcare Services Management, LLC, as set forth above, Brighton's caregiving staff was less able to contain and control the spread of COVID within Brighton's walls.

221.    As a direct and proximate result of the negligent acts and omissions of Comprehensive Healthcare Services Management, LLC, as set forth above, the Deceased Plaintiff Residents were exposed to and contracted COVID-19.

42

222.    As a direct and proximate result of the negligent acts and omissions of Comprehensive Healthcare Services Management, LLC, as set forth above, the Deceased Plaintiff Residents suffered the following damages:

      a.    The Deceased Plaintiff Residents experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for COVID-19; and,

      b.    The Deceased Plaintiff Residents incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

223.    Furthermore, because the negligence of Comprehensive Healthcare Services Management, LLC went beyond ordinary negligence into gross negligence, recklessness, and willful and wanton conduct, Plaintiffs are entitled to recover punitive damages.

WHEREFORE, Deceased Plaintiffs, claim damages of Comprehensive Healthcare Services Management, LLC d/b/a Brighton Rehabilitation and Wellness Center, and demand compensatory and punitive damages from Comprehensive Healthcare Services Management, LLC d/b/a Brighton Rehabilitation and Wellness Center in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT II

### VICARIOUS NEGLIGENCE – SURVIVAL

#### Plaintiffs v. Comprehensive Healthcare Services Management LLC d/b/a Brighton Rehabilitation & Wellness Center

224.    Plaintiff incorporates all preceding paragraphs herein.

225.    Brighton Rehab employs individuals who work in a solely managerial and supervisory capacity, and who generally do not provide hands-on care to residents. These managerial and supervisory employees include (but are not limited to) positions such as the

Administrator, Assistant Administrator, Medical Director, Director of Nursing, Assistant Director of Nursing, Infection Preventionist, and Environmental Services Director.

226.   At all relevant times, Brighton Rehab acted by and through these managerial and supervisory agents, servants, and/or employees, who were then and there acting within the course and scope of their employment. Accordingly, Brighton Rehab is vicariously liable for any negligence of these managerial and supervisory agents, servants, and/or employees.

227.   This cause of action is limited to Brighton's vicarious liability for the negligence of only these managerial/supervisory employees who generally did not provide hands-on care to residents—including but not limited to the Administrator, Assistant Administrator, Director of Nursing, Assistant Director of Nursing, Infection Preventionist, and Environmental Services Director. Plaintiffs do not seek to hold Brighton vicariously liable for the actions or inactions of Brighton's front-line caregiving nursing staff, whose members did the best they could to provide care in the dangerous environment created by Brighton and Brighton's management.

228.   Brighton's managerial and supervisory employees had the responsibility and authority to make decisions for the facility in areas such as: creating, setting, funding, and/or implementing budgets; creating and maintaining business relationships with related parties as defined by the Centers for Medicare and Medicaid Services ("CMS") that resulted in an undercapitalized and understaffed nursing home; hiring and training staff; monitoring resident acuity levels and staffing sufficiency to meet each resident's needs; admitting and discharging residents to and from the facility; and creating and enforcing Brighton's policies and procedures.

229.   Brighton's managerial and supervisory employees– such as the Administrator, Assistant Administrator, Director of Nursing, Assistant Director of Nursing, Infection

44

Preventionist, and Environmental Services Director– had a duty to make these decisions and carry out these functions with reasonable care.

230.    These types of managerial decisions had a direct impact on the quality of care Brighton was able to provide to its residents.

231.    Brighton's managerial and supervisory staff had a duty to ensure that all persons providing resident care within Brighton were competent and adequately trained to provide reasonable care to Brighton's residents.

232.    Brighton's managerial and supervisory staff had a duty to formulate, adopt, and enforce rules and policies to ensure reasonable care for Brighton's residents.

233.    Brighton's managerial and supervisory staff had a duty to supervise the nursing and caregiving staff to ensure that Brighton's policies and procedures, and basic infection protocol, were being followed.

234.    Brighton's managerial and supervisory staff negligently, recklessly, carelessly, willfully, and wantonly breached their duties owed to the Deceased Plaintiffs in the following particulars:

        a.    By failing to establish and maintain an infection prevention and control program ("IPCP") that provided a safe, sanitary and comfortable environment which prevented the development and transmission of communicable diseases and infections, namely the transmission of COVID-19, as pled herein;

        b.    By failing to establish written standards, policies, and procedures for the above-mentioned IPCP, which should have specified a system of surveillance designed to identify possible communicable diseases before they can spread to other persons in the facility, to whom and when possible incidents of communicable disease or infections should be reported, precautions to be followed to prevent the spread of infections, when and how isolation should be used for a resident, and circumstances under which the facility must

prohibit and prevent employees with communicable disease or infections from having direct contact with residents, as pled herein;

c.    By failing to provide adequate training and education to caregiving staff on infection prevention and control, as pled herein;

d.    By failing to ensure all caregiving staff members attended proper training sessions and were properly trained on infection prevention and control, and by failing to ensure all staff were properly re-educated as required; as pled herein;

e.    By failing to truthfully communicate information to residents and their families about the spread of COVID-19 within the Brighton facility, so as to allow them to make informed decisions for the wellbeing of themselves and their loved ones in the Brighton facility, as pled herein;

f.    By failing to make certain social distancing was maintained by staff, as pled herein;

g.    By failing to properly store clean linens and soiled laundry, as pled herein;

h.    By failing to ensure all employees properly wore gloves and performed hand hygiene, as pled herein;

i.    By failing to ensure all employees properly used PPE and were trained on proper use of PPE, as pled herein;

j.    By failing to ensure all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein;

k.    By choosing to keep Medicare and Medicaid funding as profit instead of staffing to meet CMS's expected nursing hours, as pled herein; and,

l.    By intentionally understaffing the facility, as pled herein.

235.    At all relevant times, Brighton's managerial and supervisory personnel had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities)

46

and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 et seq. (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

236. These state and federal regulations comprise part of the standard of care that facilities like Brighton must provide to its residents.

237. These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents such as the Deceased Plaintiff Residents.

238. These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards the Deceased Plaintiff Residents encountered at Brighton and the type of harm they suffered – specifically, contracting viral infections from other residents and/or staff.

239. Brighton's managerial and supervisory personnel negligently, recklessly, willfully, and wantonly violated these state and federal regulations in the following ways:

    a. By the failure of Brighton's administrator to enforce regulations relative to the level of health care and safety of residents, as required by 28 Pa. Code § 201.18(e)(1), as pled herein;

    b. By the failure of Brighton's administrator to develop and enforce adherence to policies and procedures to protect residents' rights, as required by 28 Pa. Code § 201.29(a), as pled herein;

    c. By failing to adequately train staff in proper implementation of policies and procedures, as required by 28 Pa. Code § 201.29(d), as pled herein;

    d. By failing to treat Plaintiffs' Decedents with consideration, respect, and full recognition of dignity and individuality, as required by 28 Pa. Code § 201.29(j), as pled herein;

47

e.   By failing to report to the appropriate health agencies and appropriate Division of Nursing Care Facilities filed office when a resident developed a reportable disease, as required by 28 Pa. Code § 211.1(a), as pled herein;

f.   By failing to design and implement resident care policies to ensure the Plaintiffs' total medical needs were met and that they were protected from infection, as required by 28 Pa. Code § 211.10(d), as pled herein;

g.   By failing to update the facility's resident care policies as necessary to meet the total medical and psychosocial needs of Brighton's residents, as required by 28 Pa. Code §211.10, as pled herein;

h.   By the director of nursing's failure to maintain standards of accepted nursing practice, as required by 28 Pa. Code §211.12(d)(1), as pled herein;

i.   By the director of nursing's failure to ensure the adequacy of the facility's nursing policy and procedure manuals, as required by 28 Pa. Code §211.12(d)(2), as pled herein;

j.   By the director of nursing's failure to ensure the adequacy of methods for coordination of nursing services with other resident services, as required by 28 Pa. Code §211.12(d)(3), as pled herein;

k.   By the director of nursing's failure to make proper recommendations for the number and levels of nursing personnel to be employed, as required by 28 Pa. Code §211.12(d)(4), as pled herein;

l.   By the director of nursing's failure to provide adequate general supervision, guidance, and assistance in implementing residents' personal health programs to assure that preventative measures, treatments, and other health services were properly carried out, as required by 28 Pa. Code §211.12(d)(5), as pled herein;

m.   By failing to protect and promote Plaintiff' Decedents rights as residents, as required by 42 C.F.R. § 483.10, as pled herein;

48

n.   By failing to ensure that every resident, including Plaintiffs' Decedents and their representatives, could exercise his or her rights without interference, coercion, discrimination, or reprisal from the facility, as required by 42 C.F.R. § 483.10(b)(1), as pled herein;

o.   By failing to treat each resident with respect and dignity and care in a manner and in an environment that promotes maintenance or enhancement of his or her quality of life, as required by 42 C.F.R. § 483.10(a)(1), as pled herein;

p.   By failing to ensure all residents, including the Deceased Plaintiffs, received the necessary care and services to attain or maintain the highest practicable qualify of life, including physical, mental, and psychosocial well-being, as required by 42 C.F.R. § 483.24, as pled herein;

q.   By failing to ensure all residents, including the Deceased Plaintiffs, received treatment and care in accordance with professional standards of practice, as required by 42 C.F.R. § 483.25, as pled herein;

r.   By failing to establish and maintain an emergency preparedness plan that meets the minimum requirements, as set forth by 42 C.F.R. § 483.73, as pled herein;

s.   By failing to establish and maintain an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of communicable diseases and infection, as required 42 C.F.R. § 483.80, as pled herein;

t.   By failing to establish a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, as required by 42 C.F.R. § 483.80(a)(1), as pled herein;

u.   By failing to establish a system of surveillance designed to identify possible communicable diseases or infections before they can spread to other persons in the facility, as required by 42 C.F.R. § 483.80(a)(2)(i), as pled herein;

v.   By failing to establish a system which specified standard and transmission-based precautions to be followed to prevent

spread of infections, as required by 42 C.F.R. § 483.80(a)(2)(iii), as pled herein;

w.  By failing to establish a system which specified when and how isolation should be used for a resident, including the type and duration of the isolation, as required by 42 C.F.R. § 483.80(a)(2)(iv), as pled herein; and,

x.  By failing to establish a system which specified the circumstances under which the facility must prohibit employees with a communicable disease from direct contact with residents, if direct contract will transmit the disease, as required by 42 C.F.R. § 483.80(a)(2)(v), as pled herein; and,

y.  By the failure of any designated Infection Preventionist(s) to administer the facility's IPCP in accordance with the requirements of 42 C.F.R. § 483.80, as pled herein.

240.  As a direct and proximate result of the negligent acts and omissions of Brighton's managerial and supervisory personnel, as set forth above, Brighton's caregiving staff was less able to contain and control the spread of COVID-19 within Brighton's walls.

241.  As a direct and proximate result of the negligent acts and omissions of Brighton's managerial and supervisory personnel, as set forth above, the Deceased Plaintiff Residents were exposed to and contracted COVID-19.

242.  As a direct and proximate result of the negligent acts and omissions of Brighton's managerial and supervisory personnel, as set forth above, the Deceased Plaintiff Residents suffered the following damages:

a.  The Deceased Plaintiff Residents experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for COVID-19; and,

b.  The Deceased Plaintiff Residents incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

50

243.    Furthermore, because the negligence of Brighton's managerial and supervisory staff went beyond ordinary negligence into gross negligence, recklessness, and willful and wanton conduct, Plaintiffs are entitled to recover punitive damages.

244.    Defendant Comprehensive Healthcare Services Management, LLC d/b/a Brighton Rehabilitation and Wellness Center is vicariously liable for the negligent acts and omissions of its managerial and supervisory staff, as set forth above, and therefore for the damages claimed herein.

WHEREFORE, Deceased Plaintiffs claim damages of Comprehensive Healthcare Services Management, LLC d/b/a Brighton Rehabilitation and Wellness Center, and demand compensatory and punitive damages from Comprehensive Healthcare Services Management, LLC d/b/a Brighton Rehabilitation and Wellness Center in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT III

### NEGLIGENCE – SURVIVAL

#### Plaintiffs v. Personal Care Medical Associates, LLC

245.    Plaintiff incorporates all preceding paragraphs herein.

246.    At all relevant times, Professional Limited Liability Company. acted within the course and scope of his employment or agency as the Medical Director of Brighton Rehabilitation and Wellness Center.

247.    Defendant Personal Care Medical Associates LLC had a duty to act prudently and to provide reasonable and ordinary care and care services to Plaintiffs and all other Brighton Residents.

51

248.    Defendant Personal Care Medical Associates LLC had a duty to coordinate all medical care provided in the facility and to ensure the adequacy and appropriateness of the medical services provided to the residents.

249.    Defendant Personal Care Medical Associates LLC had a duty to formulate, implement, and enforce adequate rules and policies to ensure quality care for Brighton's residents.

250.    Defendant Personal Care Medical Associates LLC negligently, recklessly, willfully, and wantonly breached his duties owed to Plaintiffs in the following ways:

a.    By failing to provide adequate training and education to caregiving staff on infection prevention and control, as pled herein;

b.    By failing to ensure all caregiving staff members attended appropriate trainings and were properly trained on infection prevention and control, and by failing to ensure all staff were properly re-educated as required, as pled herein;

c.    By failing to truthfully communicate information to residents and their families about the spread of COVID-19 within the Brighton facility, so as to allow them to make informed decisions for the wellbeing of their loved ones in the Brighton facility, as pled herein;

d.    By failing to make certain social distancing was maintained by staff, as pled herein;

e.    By failing to properly store clean linens and soiled laundry, as pled herein;

f.    By failing to ensure all employees properly wear gloves and perform hand hygiene, as pled herein;

g.    By failing to ensure all employees properly used PPE and were trained on proper use of PPE, as pled herein; and,

h.    By failing to ensure all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein.

251.    At all relevant times, Personal Care Medical Associates LLC, as the Medical Director of the Brighton facility had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 et seq. (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

252.    These state and federal regulations comprise part of the standard of care that facilities like Brighton must provide to its residents.

253.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents such as the Deceased Plaintiff Residents.

254.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards the Deceased Plaintiff Residents encountered at Brighton and the type of harm they suffered – specifically, contracting viral infections from other residents and/or staff.

255.    Defendant Personal Care Medical Associates LLC negligently, recklessly, willfully, and wantonly violated these state and federal regulations in the following ways:

    a.    By failing to ensure the adequacy and appropriateness of the medical services provided to Brighton's residents, as required by 28 Pa. Code § 211.2(c), as pled herein;

    b.    By failing to review incidents occurring in the Brighton facility and address the health and safety hazards of the facility, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

    c.    By failing to provide appropriate information to Brighton's Administrator to help ensure a safe and sanitary environment for residents and personnel, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

53

     d.      By failing to properly implement resident care policies, as required by 42 C.F.R. 483.70(h), as pled herein; and,

     e.      By failing to coordinate medical care in the Brighton facility, as required by 42 C.F.R. § 483.70(h), as pled herein.

256.     As a direct and proximate result of the negligent, reckless, willful and wanton actions and inactions of Personal Care Medical Associates LLC, as set forth above, the Deceased Plaintiff Residents suffered the following damages:

     a.      The Deceased Plaintiff Residents experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for COVID-19; and,

     b.      The Deceased Plaintiff Residents incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

257.     Furthermore, because the negligence of Personal Care Medical Associates LLC went beyond ordinary negligence into gross negligence, recklessness, and willful and wanton conduct, Plaintiffs are entitled to recover punitive damages.

258.     Defendant Comprehensive Healthcare Services Management, LLC d/b/a Brighton Rehabilitation and Wellness Center is vicariously liable for the acts and omissions of Personal Care Medical Associates LLC, as set forth in this Count, and are therefore jointly and severally liable for the damages claimed herein.

WHEREFORE, Deceased Plaintiffs claim damages against Defendant Personal Care Medical Associates LLC, and demand compensatory and punitive damages from Defendants Personal Care Medical Associates LLC in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT IV

### **WRONGFUL DEATH**

**Denise Hodder, Individually and as Administrator of the Estate of Brenda Cavill, v. Comprehensive Healthcare Services Management, LLC d/b/a Brighton Rehabilitation and Wellness Center and Personal Care Medical Associates LLC**

259.    Plaintiffs incorporate all preceding paragraphs.

260.    As a direct and proximate result of the negligent, reckless, willful and wanton conduct of Comprehensive Healthcare Services Management, LLC; its managerial and supervisory staff; and Personal Care Medical Associates LLC, as set forth more fully in Counts I-III, Brenda Cavill died due to complications caused by the COVID-19 virus.

261.    As a direct and proximate result of the negligent, reckless, willful and wanton conduct of Comprehensive Healthcare Services Management, LLC; its managerial and supervisory staff; and Personal Care Medical Associates LLC, as set forth more fully in Counts I-III, Plaintiffs' Wrongful Death Beneficiaries have suffered the following injuries and damages:

    a.    They have incurred expenses for the funeral and burial/internment/cremation of the decedents;

    b.    They have incurred expenses for the hospital, medical, and nursing treatment of the decedents; and,

    c.    They have lost and forever been denied the companionship, comfort, assistance, protection, guidance, counseling, society, support, and services of their loved ones Brenda Cavill.

WHEREFORE, Deceased Plaintiffs claim damages of Defendants Comprehensive Healthcare Services Management, LLC and Personal Care Medical Associates LLC, and demand compensatory and punitive damages from Defendants in an amount in excess of the jurisdictional arbitration limits, together with interest, costs of suit, and any other relief that this honorable court deems appropriate.

55

**A JURY TRIAL IS DEMANDED.**

Respectfully submitted,

ROBERT PEIRCE & ASSOCIATES, P.C.

By:_____

ROBERT F. DALEY, ESQUIRE
Counsel for Plaintiffs

## IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

### Civil Division

DENISE HODDER, Individually and as
Administrator of the Estate of BRENDA
CAVILL, Deceased;

DAVID H. ACE, as the Administrator of
the Estate of JOYCE DUNLAP, Deceased;

No.

JOHN P. MYERS, as the Administrator of
the Estate of SCOTT KENNEDY MYERS,
Deceased; and,

JILL LEMANSKI, as the Administrator of
the Estate of JEFFERY LEMANSKI,
Deceased;

        Plaintiffs,

  vs.

COMPREHENSIVE HEALTHCARE
SERVICES MANAGER LLC, d/b/a
BRIGHTON REHABILITATION &
WELLNESS CENTER; PERSONAL
CARE MEDICAL ASSOCIATES, LLC,

        Defendants.

## **VERIFICATION**

I verify that the averments of fact made in the foregoing COMPLAINT are true and correct

and based on my personal knowledge, information or belief. I understand that averments of fact in

said document are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn

falsifications to authorities.

_12-21-2021_
Dated

_____
JOHN P. MYERS

# IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

### Civil Division

DENISE HODDER, Individually and as Administrator of the Estate of BRENDA CAVILL, Deceased;

DAVID H. ACE, as the Administrator of the Estate of JOYCE DUNLAP, Deceased;

JOHN P. MYERS, as the Administrator of the Estate of SCOTT KENNEDY MYERS, Deceased; and,

JILL LEMANSKI, as the Administrator of the Estate of JEFFERY LEMANSKI, Deceased;

No.

Plaintiffs,

vs.

COMPREHENSIVE HEALTHCARE SERVICES MANAGEMENT LLC, d/b/a BRIGHTON REHABILITATION & WELLNESS CENTER and PERSONAL CARE MEDICAL ASSOCIATES, LLC,

Defendants.

## **VERIFICATION**

I verify that the averments of fact made in the foregoing COMPLAINT are true and correct and based on my personal knowledge, information or belief. I understand that averments of fact in said document are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsifications to authorities.

Dec 21, 2021
_____
Dated

_____
Denise Hodder (Dec 21, 2021 14:39 EST)
DENISE HODDER

## IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

### Civil Division

DENISE HODDER, Individually and as
Administrator of the Estate of BRENDA
CAVILL, Deceased;

DAVID H. ACE, as the Administrator of
the Estate of JOYCE DUNLAP,
Deceased;

JOHN P. MYERS, as the Administrator of
the Estate of SCOTT KENNEDY
MYERS, Deceased; and,

JILL LEMANSKI, as the Administrator of        No.
the Estate of JEFFERY LEMANSKI,
Deceased;

        Plaintiffs,

    vs.

COMPREHENSIVE     HEALTHCARE
SERVICES MANAGEMENT LLC, d/b/a
BRIGHTON    REHABILITATION    &
WELLNESS CENTER and   PERSONAL
CARE MEDICAL ASSOCIATES, LLC,

        Defendants.

## **VERIFICATION**

I verify that the averments of fact made in the foregoing COMPLAINT are true and

correct and based on my personal knowledge, information or belief. I understand that averments

of fact in said document are made subject to the penalties of 18 Pa. C.S. §4904, relating to

unsworn falsifications to authorities.

Dec 21, 2021
  Dated

                *David H Ace*
                David H Ace (Dec 21, 2021 14:22 EST)
                DAVID H. ACE

## IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

### Civil Division

DENISE HODDER, Individually and as Administrator of the Estate of BRENDA CAVILL, Deceased;

DAVID H. ACE, as the Administrator of the Estate of JOYCE DUNLAP, Deceased;

JOHN P. MYERS, as the Administrator of the Estate of SCOTT KENNEDY MYERS, Deceased; and,

JILL LEMANSKI, as the Administrator of the Estate of JEFFERY LEMANSKI,    No.
Deceased;

        Plaintiffs,

  vs.

COMPREHENSIVE    HEALTHCARE SERVICES MANAGEMENT LLC, d/b/a BRIGHTON    REHABILITATION    & WELLNESS CENTER and    PERSONAL CARE MEDICAL ASSOCIATES, LLC,

      Defendants.

### CERTIFICATE OF MERIT REGARDING DEFENDANT COMPREHENSIVE HEALTHCARE SERVICES MANAGEMENT LLC d/b/a BRIGHTON REHABILITATION & WELLNESS CENTER

I, Robert F. Daley, Esquire, certify that:

An appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by the defendant in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about harm;

And

1

_____ The claim that defendant deviated from an acceptable professional standard is based solely or in part on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard and an appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by the other licensed professionals in the treatment, practice or work that is the subject of the Complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm;

Or

_____ Expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim against these defendants.

Respectfully submitted,

ROBERT PEIRCE & ASSOCIATES, P.C.

By:_____
ROBERT F. DALEY, ESQUIRE
Counsel for Plaintiffs

2

## IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

### Civil Division

DENISE HODDER, Individually and as Administrator of the Estate of BRENDA CAVILL, Deceased;

DAVID H. ACE, as the Administrator of the Estate of JOYCE DUNLAP, Deceased;

JOHN P. MYERS, as the Administrator of the Estate of SCOTT KENNEDY MYERS, Deceased; and,

JILL LEMANSKI, as the Administrator of the Estate of JEFFERY LEMANSKI, Deceased;

                  Plaintiffs,

    vs.

COMPREHENSIVE    HEALTHCARE SERVICES MANAGEMENT LLC, d/b/a BRIGHTON    REHABILITATION    & WELLNESS CENTER and   PERSONAL CARE MEDICAL ASSOCIATES, LLC,

                  Defendants.

No.

### CERTIFICATE OF MERIT REGARDING DEFENDANT
### PERSONAL CARE MEDICAL ASSOCIATES, LLC



I, Robert F. Daley, Esquire, certify that:

An appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by the defendant in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about harm;

And

1

✓    The claim that defendant deviated from an acceptable professional standard is based solely or in part on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard and an appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by the other licensed professionals in the treatment, practice or work that is the subject of the Complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm;

Or

_____    Expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim against these defendants.

Respectfully submitted,

ROBERT PEIRCE & ASSOCIATES, P.C.

By: _____

ROBERT F. DALEY, ESQUIRE
Counsel for Plaintiffs

2

## IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

### Civil Division

DENISE HODDER, Individually and as
Administrator of the Estate of BRENDA
CAVILL, Deceased;

DAVID H. ACE, as the Administrator of
the Estate of JOYCE DUNLAP, Deceased;

JOHN P. MYERS, as the Administrator of
the Estate of SCOTT KENNEDY MYERS,
Deceased; and,

JILL LEMANSKI, as the Administrator of
the Estate of JEFFERY LEMANSKI,       No.
Deceased;

        Plaintiffs,

    vs.

COMPREHENSIVE       HEALTHCARE
SERVICES MANAGEMENT LLC, d/b/a
BRIGHTON    REHABILITATION    &
WELLNESS CENTER and   PERSONAL
CARE MEDICAL ASSOCIATES, LLC,

        Defendants.

### CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by:_Robert F. Daley, Esquire_____

Signature:_____

Attorney No.: _____81992_____